1  UNITED STATES DISTRICT COURT
2  DISTRICT OF PUERTO RICO

3  DUAMEL SANTIAGO-RAMOS, et al.,

4  Plaintiffs,                                    Civil No. 11-1987 (JAF)

5  v.

6  AUTORIDAD DE ENERGIA ELECTRICA, et al.,

7  Defendants.

8

9  **OPINION AND ORDER**

10  Plaintiffs Duamel Santiago-Ramos[1] ("Santiago-Ramos") and the Caribbean

11  Economic Council ("CEC") (together, "Plaintiffs") sue the Autoridad de Energia Electrica

12  (known in English as the Puerto Rico Electric Power Authority,[2] or "PREPA") and

13  PREPA's former chairperson of the board, Marimar Pérez-Riera, alleging a number of

14  federal statutory and constitutional violations.[3]  (Docket No. 7.)  Bringing suit under 42

15  U.S.C. § 1983, Plaintiffs allege violations of the First, Fifth and Fourteenth Amendments of

16  the United States Constitution, as well as violations of 156 U.S.C. §§ 2–3 (the "Robinson

17  Patman Act").[4]  (Docket No. 7.)  Defendants move to dismiss the complaint for failure to

18  state a claim, (Docket No. 17), Plaintiffs respond, (Docket No. 19), and Defendants reply

19  (Docket No. 24).

---

[1] Santiago-Ramos also brings suit on behalf of his conjugal partnership, Santiago Marines Rivera Figueroa. (Docket No. 7 at 1, 3.)

[2] 22 L.P.R.A.§ 193 (1979).

[3] After filing their original complaint, Plaintiffs moved to amend their complaint, (Docket No. 5) which we granted (Docket No. 6).  Plaintiffs' amended complaint, (Docket No. 7), is therefore the operative pleading.

[4] Plaintiffs' amended complaint also mentions that Plaintiffs intend to pursue class certification.  (Docket No. 7 at 24–27.) As we explain below, we defer the question of whether and how to certify a class.  See Section III.H.

Civil No. 11-1987 (JAF)                                                                  -2-

1                                    **Factual Allegations**

2           We draw upon the amended complaint to create the following summary of the facts

3    alleged.   (Docket No. 7.)   Duamel Santiago-Ramos ("Santiago-Ramos") is a citizen of

4    Puerto Rico and member of the Caribbean Economic Council ("CEC").   CEC is a non-profit

5    association whose members are customers of PREPA and who wish to promote economic

6    development in Puerto Rico.  (Id. at 3.)  Santiago-Ramos has an active account with PREPA

7    that he has maintained for several years.  (Id.)  Codefendant Marimar Pérez-Riera (Pérez-

8    Riera) was chairperson of PREPA's board of directors at the time the suit was originally

9    filed.  (Docket No. 7 at 4.)  The complaint also names various unnamed defendants who are

10   members of the governing board of PREPA.  (Id.)

11          PREPA is a public corporation created by legislative act for the purpose of providing

12   electric power to Puerto Rico.  22 L.P.R.A. § 193 (1979).  PREPA has exclusive control of

13   the electricity market in Puerto Rico: it generates, produces, distributes and sells all of the

14   electricity on the island.  (Docket No. 7 at 6.)  PREPA's megawatt-hour sales rank it as the

15   fifth largest public utility company in the United States, just behind the Los Angeles

16   Department of Water and Power.  (Id. at 10.)  In electric revenue, PREPA is the largest

17   utility in the United States.  (Id.)  In 2009, PREPA had electric energy revenues of over four

18   billion dollars.  (Id.)

19          In addition to its monopoly control over the electricity market, PREPA also has full

20   rate-setting authority.   (Id. at 11.)   PREPA advertises both of these attributes in the

21   marketing materials it gives to prospective bondholders.[5]  (Id.)  Puerto Rico's legislature

22   does not have veto authority over the rates that PREPA sets.  (Id.)

---

[5] Plaintiffs provide a copy of the materials.  (Docket No. 7-1.)

1    Plaintiffs contend that the governing party exploits these attributes to use PREPA as

2    a cash cow for partisan purposes.  (Id.)  Without any meaningful public oversight, the

3    government uses PREPA to shower benefits on politically favored political and religious

4    entities.  (Id.)  The complaint alleges that "PREPA has become a political functionary of the

5    party" in power.  (Id. at 6.)  The party in power uses PREPA for various purposes: to

6    subsidize politically favored entities; to borrow money for, and lend money to, other

7    governmental agencies and political subdivisions; to favor certain religious groups over

8    others; and to subsidize welfare recipients.[6]  (Id.)  PREPA also charges vastly different rates

9    to different sectors of the economy, distinguishing between basic, special, and public

10   housing residential; agricultural; streets and highways; parks; etc.  (Id. at 16–17.)  Plaintiffs

11   allege that these distinctions are "arbitrary" and "capricious."  (Id. at 17.)  Although PREPA

12   is exempted from taxes by law, in 2010, PREPA made a payment (known as "contribution

13   in lieu of taxes") of $224 million to the Commonwealth.  (Id. at 12.)

14   PREPA then passes off the cost of these subsidies to ordinary consumers of

15   electricity in Puerto Rico.  (Id.)  The costs are passed to consumers in a "fuel adjustment

16   charge" that appears on consumers' bills.  Consumers are not able to see what costs actually

17   go into the "fuel adjustment charge"; they are only allowed to see what portion of their bill

18   is based on it.  In 2009, the "fuel adjustment charge" generated seventy-three percent of

19   PREPA's revenues.  (Id. at 11, 18.)  The "fuel adjustment charge" levied by PREPA

20   amounts to approximately $0.21 per kilowatt hour of energy use.  (Id. at 13.)  Plaintiffs call

---

[6] Plaintiffs provide estimates of each of the subsidies paid for with money generated by the "fuel adjustment charge": $190 million for political subdivisions and municipalities; $29 million to residential services; $ 3.5 million for churches and other non-profit associations; $6.5 million to the tourism sector; $18 million to public housing projects; $9.8 million to private industries; $15 million for development incentives; $1.8 million in agricultural subsidies; and $90 million for public education.  (Id. at 9.)

Civil No. 11-1987 (JAF)                                                                                    -4-

1   this amount "unreasonably high" compared to other public utilities that also buy energy on

2   the interstate market and charge less than half that amount.  (Id. at 13–14.)  Plaintiffs

3   provide a chart showing the comparable amounts that many utilities pay in other

4   jurisdictions of the U.S.  (Id. at 14–15.)

5        PREPA describes the fuel adjustment rate as a "pass-through" rate, implying that the

6   charge is merely a reflection of the cost PREPA pays to purchase fuel.  (Id. at 23.)  Yet

7   Plaintiffs call this characterization false.  (Id.)  Citing an audited financial statement from

8   2010, Plaintiffs argue that the fuel adjustment charge generates a gain of one billion dollars

9   for PREPA's coffers. (Id.)  In 2010, PREPA spent approximately two billion dollars to

10  purchase fuel, while generating three billion dollars from the fuel adjustment charge.  (Id. at

11  18.)  PREPA then uses a portion of this one billion dollars to pay for the political goals of

12  the party in power.  (Id. at 19.)

13       The subsidies granted by PREPA contribute to the extremely high cost of electricity

14  in Puerto Rico.  (Id.)  Puerto Rico has the highest cost, per capita, for electricity of any state

15  in the United States.  (Id. at 7.)  Residents of Puerto Rico pay up to three times more than

16  the average American household for electricity.  (Id.)  Moreover, this high cost of electricity

17  is particularly burdensome in Puerto Rico, where per capita income in 2010 was less than

18  half of what it was in the mainland United States.  (Id.)  Nor is the economic picture

19  improving: between 2007 and 2010, Puerto Rico's economy shrank between one and five

20  percent per year.  (Id.)

21       Plaintiffs argue that because PREPA enjoys a monopoly over the electricity market in

22  Puerto Rico, consumers have no choice but to purchase electricity from PREPA. (Id.)  To

23  purchase electricity in Puerto Rico, consumers must pay the "fuel adjustment charge,"

1   which the government then uses to subsidize its own partisan and religious aims.  (Id.)  The

2   result is that Plaintiffs are forced to associate with political and religious entities against

3   their will.

4          From approximately 2008 to 2011, PREPA's executive director was Miguel Cordero

5   ("Cordero").  (Id. at 19.)  The complaint alleges that Cordero gave his closest associates and

6   employees a fifty percent salary increase, which Plaintiffs call "predatory" and which cost,

7   in the aggregate, millions of dollars.  (Id.)  The cost of these large salary increases were then

8   also passed onto consumers.   (Id.)   When Cordero resigned abruptly due to political

9   pressure, a new executive director, Antonio Escudero ("Escudero"), was named.  (Id.)

10          Escudero came to PREPA from the Puerto Rico Ports Authority, which during his

11   tenure had allegedly received over $50 million worth of subsidized electric power from

12   PREPA.  (Id.) Escudero's appointment, however, was short lived: almost immediately after

13   he was named executive director, an incident came to light that resulted in his termination.

14   (Id. at 20.)  In 2006, Escudero was suspected of having installed a device at his home in

15   Dorado that altered the true amount of his household's electricity consumption.  (Id.)  After

16   news of this incident circulated, Escudero was removed from consideration.  (Id.)  His

17   nomination was scuttled less than thirty-six hours after it was announced.  (Id.)

18                                                    **I.**

19                          **Motion to Dismiss Under Rule 12(b)(6)**

20          A defendant may move to dismiss an action, based solely on the complaint, for the

21   plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P.

22   12(b)(6).  In assessing such a motion, we "accept[] all well-pleaded facts as true, and we

Civil No. 11-1987 (JAF)                                                                                  -6-

1    draw all reasonable inferences in favor of the [plaintiff]." <u>Wash. Legal Found. v. Mass. Bar</u>

2    <u>Found.</u>, 993 F.2d 962, 971 (1st Cir. 1993).

3           "[A]n adequate complaint must provide fair notice to the defendants and state a

4    facially plausible legal claim." <u>Ocasio-Hernández v. Fortuño-Burset</u>, 640 F.3d 1, 12 (1st

5    Cir. 2011).   In considering a complaint's adequacy, we disregard "statements in the

6    complaint that merely offer legal conclusions couched as fact or threadbare recitals of the

7    elements of a cause of action." <u>Id.</u> (internal quotation marks omitted).  We then take as true

8    what remains, "[n]onconclusory factual allegations . . . even if seemingly incredible." <u>Id.</u>

9    On the basis of those properly pled facts, we assess the "reasonableness of the inference of

10   liability that the plaintiff is asking the court to draw." <u>Id.</u> at 13.

11                                                **III.**

12                                            <u>**Analysis**</u>

13          **A. <u>Freedom of Association</u>**

14          Plaintiffs' first cause of action states that Defendants have violated their rights to

15   freedom of association.  (Docket No. 7 at 27.)

16          The Supreme Court has held that "at the heart of the First Amendment is a belief in

17   that an individual should be free to believe as he will, and that in a free society one's beliefs

18   should be shaped by his mind and his conscience rather than coerced by the State." <u>Abood</u>

19   <u>v. Detroit Bd. of Ed.</u>, 431 U.S. 209, 235 (1977) (citing <u>Elrod v. Burns</u>, 427 U.S. 353, 356–

20   57 (1976); <u>Stanley v. Georgia</u>, 394 U.S. 595, 597 (1969); <u>Cantwell v. Connecticut</u>, 310 U.S.

21   296, 303–04 (1940)).  Thomas Jefferson memorably stated this principle long ago, writing:

1   "[T]o compel a man to furnish contributions of money for the propagation of opinions

2   which he disbelieves, is sinful and tyrannical."   Thomas Jefferson, Virginia Statute for

3   Religious Freedom (1786), in Jefferson: Writings 346 (Merrill D. Peterson ed., 1984).

4   Applying these principles, the Supreme Court has struck down schemes that require

5   "compulsory subsidization of ideological activities" by union employees who object to the

6   ideological or partisan activities of their union.  Abood, 431 U.S. at 237.

7          The Court has applied these principles in other contexts as well, for example

8   invalidating the "conditioning [of] public employment on political faith."  Elrod, 427 U.S. at

9   356 (1976).  Indeed, these principles apply "[r]egardless of the inducement, whether it be by

10  the denial of public employment, or the influence of a teacher over a student."  Id. (citing

11  West Virginia Bd. of Ed. v. Barnette, 319 U.S. 624, 642 (1943) ("If there is any fixed star in

12  our constitutional constellation, it is that no official, high or petty, can prescribe what shall

13  be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to

14  confess by word or act their faith therein.").)   "These protections reflect our 'profound

15  national commitment to the principle that debate on public issues should be uninhibited,

16  robust, and wide-open,' New York Times Co. v. Sullivan, 376 U.S. 254 (1976), a principle

17  itself reflective of the fundamental understanding that 'competition in ideas and

18  governmental policies is at the core of our electoral process.'"   Elrod, 427 U.S. at 357

19  (quoting Williams v. Roades, 393 U.S. 32, 35 (1968)).

20         Plaintiffs allege that Defendants compel them to pay for a fuel adjustment charge that

21  subsidizes political or partisan activity to which they object.  (Docket No. 7.)  Defendants

1   achieve this by virtue of their monopoly control of the electricity power market in Puerto

2   Rico.  (Id.)  A complete absence of transparency prevents citizens and consumers from

3   knowing how the fuel adjustment charge is calculated, or how much power is given away at

4   a discount, and to which entities.  (Id.)  These allegations are sufficient to state a claim

5   under the First Amendment.  Abood, 431 U.S. at 237 (holding that citizens cannot be forced

6   to subsidize ideological activities to which they object); see also Keller v. State Bar of

7   California, 496 U.S. 1 (1990) (holding that a state bar association's use of compulsory dues

8   to finance ideological activities with which members disagree constitutes a First

9   Amendment violation); Romero v Colegio De Abogados de P.R., 204. F. 3d 291, 300–02

10  (1st Cir. 2000) (explaining that the First Amendment's protection from coerced

11  contributions extends to activity that is non-ideological and non-germane).

12        Faced with Plaintiffs' allegations, Defendants present a number of legal arguments

13  that we easily reject.[7]  First, Defendants argue that Plaintiffs have failed to plead state

14  action.  (Docket No. 17 at 3, 4.)  "Unless . . . defendants [are] state actors, either directly or

15  by a close enough nexus to the state in defined ways, there is neither a 1983 claim nor a

16  claim against them for a violation of constitutional rights."  Tomaiolo v. Malinoff, 281 F.3d

17  1, 8 (1st Cir. 2002).  In this case, PREPA easily meets the "nexus" test: for example,

18  Plaintiffs' complaint cites to PREPA's enabling legislation and notes that PREPA is a

19  "governmental instrumentality of the Commonwealth of Puerto Rico." (Docket No. 7 at 5.)

20  This is sufficient to meet the constitutional state action requirement.  See Rodriguez-Burgos

_____
[7] Inexplicably, Defendants repeatedly refer only to Plaintiffs' original complaint, Docket No. 1, ignoring Plaintiffs' more recent amended complaint, Docket No. 7, the operative pleading. (Docket No. 17.)

1  v. Electric Energy Auth., 853 F.2d 31, 35 (1st Cir. 1988) (allowing constitutional claim

2  against PREPA, a "quasi-public corporation" that "exercises broad powers in the

3  implementation of the island's economic development policies").

4         We also reject Defendants' arguments that Plaintiffs' claims are time-barred.  "A

5  claim under § 1983 takes the statute of limitations from the underlying state cause of action.

6  . . . In Puerto Rico, the limitations period for personal injuries is one year."  Perez-Sanchez

7  v. P.R. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008) (citations omitted).  Plaintiffs'

8  complaint alleges that they were forced to pay a fuel adjustment charge in August 2011, two

9  months before they filed their complaint.  (Docket No. 7 at 13.)  This fuel adjustment

10 charge, well within the one-year statute of limitations, allegedly "constituted a separate

11 actionable wrong."  Romero, 204 F.3d at 303–04 (quoting Muniz-Cabrero v. Ruiz, 23 F.3d

12 607, 610 (1st Cir. 1994)).  Therefore, we deem Plaintiffs' complaint timely.  Id. (noting that

13 "annually compelled payments violate [Plaintiffs'] First Amendment rights with every new .

14 . . payment") (citations omitted).

15        **B.  Establishment Clause**

16        Plaintiffs' second cause of action states that Defendants have violated the

17 Establishment Clause.  (Docket No. 7 at 28.)

18        The Establishment Clause states that "Congress shall make no law respecting an

19 establishment of religion."  U.S. Const. Amend. I.  "Although applicable originally only

20 against the federal government, the Establishment Clause has since been incorporated to

21 apply to the states by the Fourteenth Amendment."  Freedom from Religion Found. v.

1   Hanover Sch. Dist., 626 F.3d 1, 6–7 (1st Cir. 2010) (citing Everson v. Bd. of Educ., 330

2   U.S. 1 (1937)).   To determine whether a government action violates the Establishment

3   Clause,

4       the Supreme Court has articulated three interrelated analytical approaches: the
5       three-prong analysis set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-613,
6       (1971); the "endorsement" analysis, first articulated by Justice O'Connor in
7       her concurrence in Lynch v. Donnelly, 465 U.S. 668, 688, and applied by a
8       majority of the Court in County of Allegheny v. ACLU, 492 U.S. 573, 109
9       (1989); and the "coercion" analysis of Lee v. Weisman, 505 U.S. 577, 587
10      (1992).

12  Hanover Sch. Dist., 626 F.3d at 7.

13      Defendants argue that Plaintiffs have failed to state a claim under any of these

14  three approaches.  (Docket No. 17 at 6.)  Plaintiffs respond that PREPA's subsidies

15  to churches advance religious over secular entities.  (Docket No. 19 at 8.)   The

16  complaint alleges that PREPA provides $3,500,000 in subsidies to churches and

17  other non-profit associations.  (Docket No. 7 at 9.)

18      We find that Plaintiffs have stated a viable claim under the "endorsement analysis" of

19  Establishment Clause jurisprudence.    Hanover Sch. Dist., 626 F.3d at 7.   Under the

20  "endorsement analysis, courts must consider whether the challenged governmental action

21  has the purpose or effect of endorsing, promoting or advancing religion."  Id. at 10 (citing

22  Cnty. of Allegheny, 492 U.S. at 593–94).  A state practice may not "send the ancillary

23  message to members of the audience who are nonadherents that 'that they are outsiders, not

24  full members of the political community, and an accompanying message to adherents that

1     they are insiders, favored members of the political community." <u>Id.</u> (quoting <u>Santa Fe</u>

2     <u>Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 309–10 (2000) (internal quotations omitted)).

3         At this early stage of the proceedings, Plaintiffs' complaint satisfies the liberal

4     pleading standards required for their claim to survive. <u>Ocasio-Hernández</u>, 640 F.3d 1, 12

5     (1st Cir. 2011). We think it plausible that, when viewed from the perspective of an

6     "objective observer," PREPA's practice of subsidizing churches may have the "effect of

7     endorsing, promoting or advancing religion." <u>Hanover Sch. Dist.</u>, 626 F.3d at 7 (citations

8     omitted). Before discovery has taken place, the secrecy surrounding these subsidies makes

9     it impossible to know what form the subsidies take, and which organizations receive them.

10    Plaintiffs allege that PREPA's use of $3,500,000 in subsidies to give to churches (and other

11    non-profit organizations) advances religious over secular organizations. Defendants have

12    provided us with no account whatever of how these funds are allocated, or how their

13    distribution avoids the "effect of endorsing, promoting or advancing religion." <u>Id.</u> Drawing

14    on our "experience and common sense," we find that Plaintiffs' claim of an Establishment

15    Clause violation meets the "plausibility" threshold of Rule 8. <u>Ashcroft v. Iqbal</u>, 556 U.S.

16    662, 664 (2009). Therefore, this portion of Defendants' motion to dismiss will be denied.

17        **C. <u>Robinson-Patman Act</u>**

18        Plaintiffs also claim that Defendants have violated the Robinson-Patman Act, 15

19    U.S.C. § 13(a) (the "Act"). (Docket No. 7 at 31.) In their motion to dismiss, Defendants

20    argue that Plaintiffs have not met their burden of proving jurisdiction under §2(a) of the Act.

21    (Docket No. 17 at 8–10.) Plaintiffs respond that PREPA's participation in interstate bond

Civil No. 11-1987 (JAF)                                                                      -12-

1   markets satisfies the jurisdictional "in commerce" requirement of §2(a).  (Docket No. 19 at

2   12–14.)  We agree with Defendants.

3        "Whether [a] district court has subject matter jurisdiction over these types of

4   violations is largely determined by the Supreme Court's decision construing § 2(a) of the

5   Robinson-Patman Act, 15 U.S.C. § 13(a)."  <u>Able Sales Co., Inc. v. Compania de Azucar de</u>

6   <u>P.R.</u>, 406 F.3d 56, 61 (1st Cir. 2005) (citing <u>Gulf Oil Corp. v. Copp Paving Co., Inc.</u>, 419

7   U.S. 186, (1974)).  <u>Gulf Oil</u> held that

8        § 2(a) of the Robinson-Patman Act did not extend jurisdiction to the full
9        extent of Congress's constitutional power granted by the Commerce Clause. . .
10     . [T]he distinct 'in commerce' language . . . appears to denote only persons or
11     activities within the flow of interstate commerce. . . . [T]he jurisdictional
12     requirements of these provisions cannot be satisfied merely by showing that
13     allegedly anticompetitive acquisitions and activities affect commerce.   To
14     satisfy the 'in commerce' requirement, one of the discriminatory sales must
15     cross a state line.  As this requirement is jurisdictional, the burden to prove the
16     interstate character of the sales is on the party asserting subject matter
17     jurisdiction.
18
19   <u>Able Sales Co.</u>, 406 F.3d at 61 (internal quotations and citations omitted).

20        In <u>Gulf Oil</u>, the Court qualified its ruling by "specifically not[ing] the absence of two

21   claims: that the defendant made interstate sales or was 'otherwise directly involved in

22   national markets' or that 'the local market . . . is an integral part of the interstate market in

23   other component commodities or products.'"  <u>Id.</u> at 52 (quoting <u>Gulf Oil</u>, 419 U.S. at 199).

24   The First Circuit refers to such claims as "intermediate definitions" of interstate commerce;

25   the circuit has left open the question whether such "intermediate definitions" might be

26   sufficient to meet the jurisdictional requirement of the Act. <u>Id.</u>

Civil No. 11-1987 (JAF)                                                                          -13-

1      Plaintiffs argue that PREPA's allegedly discriminatory sales of electricity fit within

2   these "intermediate definitions." (Docket No. 19 at 11.) Specifically, Plaintiffs argue that

3   because PREPA sells bonds across state lines, Defendants are "otherwise directly involved

4   in national markets" or, alternatively, that "the local market . . . is an integral part of the

5   interstate market in other component commodities or products."[8] (Docket No. 19 at 13.)

6   We are not persuaded.

7      The First Circuit has not ruled out the possibility that such an "intermediate

8   definition" of interstate commerce might satisfy the jurisdictional requirements of the Act.

9   Able Sales, 406 F.3d at 52.  Still, we are unaware of any cases in which such an

10  "intermediate definition" has been held sufficient,[9] and we do not think the circumstances of

11  this case would meet the test.  If the mere participation of PREPA in interstate bond markets

12  were sufficient to create a jurisdictional hook, the stringent "in commerce" requirement of

13  the Robinson-Patman Act would be dramatically weakened.  As the Eleventh Circuit stated,

14  "the cases establish that the state of being 'in commerce' under § 2(a) of the Robinson-

15  Patman Act requires physical movement of the relevant product across a state line."

16  McCallum v. City of Athens, 976 F.2d 649, 656 (11th Cir. 1996) (emphasis in original)

17  (quoting S & M Materials Co. v. Southern Stone Co., 612 F.2d 198, 200 (5th Cir.1980)).

18  The relevant question is whether the discriminatory sales themselves—in this case, allegedly

19  the electricity sales, not the bond offerings—cross state lines. See id. ("valid Robinson-

_____

[8] Plaintiffs allege that PREPA uses its revenues from electricity sales as collateral for interstate bond holders.

[9] Plaintiffs have pointed us to none, and we found none in our research.

Civil No. 11-1987 (JAF)                                                                         -14-

1    Patman claim must allege that 'at least . . . one discriminatory sale was made in interstate

2    commerce'") (quoting <u>Gulf Oil</u>, 419 U.S. at 195).  Because there is no evidence that there

3    were any discriminatory interstate sales of electricity, Plaintiffs have failed to satisfy the

4    jurisdictional requirement of the statute.  This portion of Defendants' motion to dismiss will

5    therefore be granted.

6         **D. <u>Takings Claim</u>**

7         Plaintiffs argue that the fuel adjustment charge constitutes an unjust taking without

8    compensation from individual consumers.  (Docket No. 7 at 29.)  In their motion to dismiss,

9    Defendants argue that Plaintiffs' claim is unripe, because Plaintiffs have failed to seek

10   compensation through Commonwealth procedures.   (Docket Nos. 17 at 7; 24 at 6–7.)

11   Plaintiffs contend that no such resort to state procedures is required because "there is no

12   administrative procedure for compensation in state courts required by law and that there is

13   no independent review board to guard for the federal[ly] mandated constitutional

14   guarantees." (Docket No. 19 at 9.)

15        The First Circuit has stated that "a takings claim ordinarily is considered unripe if the

16   claimant comes directly to a federal court without first seeking compensation from state

17   procedures."  <u>Deniz v. Municipality of Guaynabo</u>, 285 F.3d 142, 146 (1st Cir. 2002) (citing

18   <u>Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank</u>, 473 U.S. 172 (1985)).  In

19   <u>Williamson County</u> the Supreme Court held that "if a State provides an adequate procedure

20   for seeking just compensation, the property owner cannot claim a violation of the Just

21   Compensation Clause until it has used the procedure and been denied just compensation."

Civil No. 11-1987 (JAF)                                                                -15-

1    473 U.S at 195. This is known as the "state litigation requirement."[10]  Id.  A narrow

2    exception to the state litigation requirement may apply, however, if "all potential state

3    remedies are 'unavailable or inadequate.'"  Deniz, 285 F.3d 146 (quoting Williamson Cnty.,

4    473 U.S. at 196–97).[11]

5         This is precisely what we understand Plaintiffs to be alleging here.  (Docket No. 19 at

6    9–10.)    Plaintiffs argue that Puerto Rico has no adequate procedure to prevent a taking by

7    PREPA.  (Id.) Without an independent regulatory commission to review and oversee

8    PREPA's rates, the utility imposes an unconstitutional fuel adjustment charge that is

9    "capricious, arbitrary and predatory."  (Docket No. 7 at 1.)  We think that this is sufficient to

10   state a viable takings claim at this stage of the proceedings.  The procedures that Defendants

11   point to are inadequate to remedy the allegedly unconstitutional taking of PREPA's fuel

12   adjustment charge.

13        Defendants argue that there are two mechanisms under Commonwealth law that

14   Plaintiffs have failed to exhaust.  (Docket No. 24 at 6.)  First, Puerto Rico's Public Law No.

15   33 of June 27, 1985, as amended, known as the "Act to Establish Minimum Procedural

16   Requirements for the Suspension of Essential Public Service," provides PREPA customers a

17   procedure "to question the accuracy and source of the charges invoiced." 27 L.P.R.A. § 262

---

[10] Plaintiffs' response suggests that this requirement applies only to takings of real property.  (Docket No. 19 at 9.)  Yet the case law establishes that "it is insufficient to argue only that the alleged taking in [Plaintiff's] case is different" than a taking of real property.  See Downing, 643 F.3d at 27 (rejecting plaintiff's argument that the ripeness requirements of Williamson County apply only to takings of real property).

[11] In this circuit, "[i]t is well settled that the burden of demonstrating the absolute lack of an adequate state proceeding is on the plaintiff." Downing, 643 F.3d at 25 (quoting Flores-Galarza, 484 F.3d at 45); see also Estate of Bennett v. Wainwright, 548 F.3d 155, 165 (1st Cir. 2008)).

Civil No. 11-1987 (JAF)                                                    -16-

1   (2011).  Another listed purpose of the statute is to "guarantee an adequate disclosure of the

2   complete procedure established."  Id.

3          Pursuant to § 262b, PREPA customers can object to their bills and request an

4   investigation "before the designated official in the local office from which he/she receives

5   the service, who shall be empowered to correct mistakes or overcharges."  Id.  If the

6   customer is not satisfied with the resolution of her objection, he can object "before another

7   official designated as representative of the region" in which the customer resides; if the

8   customer is still not satisfied, he can request that this second decision be reviewed by the

9   executive director of PREPA.  Id.  A customer can appeal that decision as well, in which

10  case an attorney, serving as an examining officer, will make the final determination.  Id.  At

11  this stage, if the investigation is still pending, the customer must pay an amount equal to his

12  average consumption bill.  Id.  If the attorney resolves against the customer, the customer

13  has twenty days to pay the full bill.  Id.  If the customer is still not satisfied, he can appeal

14  for judicial review in Puerto Rico's Court of First Instance.  Id.

15         Pursuant to the above statute, PREPA has adopted a procedure for objecting to

16  customer bills.[12]  The procedure is laid out in Section XIII of PREPA's "Regulation

17  Governing the General Terms and Conditions for Supplying Electric Power."[13]  The

18  procedures are virtually identical to the ones provided by 27 L.P.R.A. § 262; the only

---

[12] These regulations are the second Commonwealth procedure that Defendants claim Plaintiffs have failed to exhaust.  (Docket No. 24 at 6.)

[13] Regulation Governing the Terms and Conditions of Supplying Electric Power, PREPA Resolution No. 3756, Aug. 24, 2010, available at http://www.aeepr.com/DOCS/manuales/Term%20&%20Conditions%20-%20PREPA%20Ingles.pdf

1    material difference between the two sets of procedures appears to be the identity of the

2    examining official: § 262b provides that the attorney examining officer is also a PREPA

3    employee, while PREPA's own "Regulation" provides that the attorney examining officer is

4    not a PREPA employee.

5          As we understand them, these procedures are simply not the proper vehicles for

6    Plaintiffs to mount their constitutional challenge to the fuel adjustment charge.  Plaintiffs do

7    not seek to challenge the "accuracy and source of the charges invoiced" on their bills, 27

8    L.P.R.A. § 262 (2011). The scope of Plaintiffs' challenge is much broader than the type of

9    dispute for which these Commonwealth procedures are designed.  Plaintiffs are not arguing

10   that PREPA incorrectly charged them for too many kilowatt hours or made a mistake in

11   calculating their bill.  What Plaintiffs seek to challenge is the entire way the fuel adjustment

12   charge is calculated—its lack of transparency and oversight, as well as its hidden costs and

13   subsidies.     (Docket Nos. 7; 19.)    If Plaintiffs were suing to correct "mistakes or

14   overcharges" on their individual bill, § 262b, these Commonwealth procedures might be

15   adequate to prevent a taking.  But that is not the sort of challenge that Plaintiffs bring here:

16   instead, they seek to remedy an allegedly unconstitutional pricing scheme that affects 1.8

17   million customers of PREPA every month.  (Docket No. 7 at 1.)  For that, Plaintiffs have

18   chosen to bring their complaint as a class action in federal court.  (Id.)  At this stage of the

19   proceedings, we find that Plaintiffs have carried their burden of showing that that all

20   potential Commonwealth remedies are "unavailable or inadequate."   Downing, 643 F.3d at

21   25.  Plaintiffs' takings claim will be allowed to proceed.

1    **E. <u>Due Process Claim</u>**

2    Plaintiffs also allege a due process claim.  (Docket No. 7 at 29.)  Plaintiffs do not

3    make clear whether their argument is under substantive or procedural due process.  (<u>Id.</u>)  We

4    therefore evaluate the complaint under both grounds.

5    The Fourteenth Amendment prohibits states from "depriving any person of life,

6    liberty, or property without due process of law." U.S. Const. Amend. XIV. This

7    constitutional guarantee "has both substantive and procedural components." <u>Pagán v.</u>

8    <u>Calderón</u>, 448 F.3d 16, 32 (1st Cir.2006).  The procedural due process component

9    guarantees that "before a significant deprivation of liberty or property takes place at state's

10   hands, the affected individual must be forewarned and afforded an opportunity to be heard

11   'at a meaningful time and in a meaningful manner.'" <u>Amsden v. Moran</u>, 904 F.2d 748, 753

12   (1st Cir. 1990) (quoting <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552 (1965)).  In contrast, "the

13   substantive due process claim implicates the essence of state action rather than its

14   modalities." <u>Id.</u>

15   "A substantive due process claim requires allegations that the government conduct

16   was, in and of itself, inherently impermissible irrespective of the availability of remedial or

17   protective procedures." <u>Maymi v. P.R. Ports Auth.</u>, 515 F.3d 20, 30 (1st Cir. 2008) (citing

18   <u>Amsden</u>, 904 F.2d at 755).  "The state conduct itself must be so brutal, demeaning, and

19   harmful that it is shocking to the conscience." <u>Id.</u> (citing <u>Rochin v. California</u>, 342 U.S. 165

20   (1952)).

1    We find that Plaintiffs' allegations in this case "are insufficient to cross this

2  constitutional threshold."  Id.  Cases that have involved substantive due process violations

3  "have often involved state action that was highly physically intrusive." Cruz–Erazo v.

4  Rivera–Montanez, 212 F.3d 617, 622 (1st Cir.2000) (collecting cases).  Additionally, the

5  "conscience-shocking concept points clearly away from liability, or clearly toward it, only at

6  the ends of the tort law's culpability spectrum: Liability for negligently inflicted harm is

7  categorically beneath the constitutional due process threshold." Cnty. of Sacramento v.

8  Lewis, 523 U.S. 833, 834 (1998). On the other hand, "conduct deliberately intended to

9  injure in some way unjustifiable by any government interest is the sort of official action

10  most likely to rise to the conscience-shocking level." Id.

11    Plaintiffs' allegations do not rise to this very demanding standard.  However

12  regrettable PREPA's alleged actions may be, none of the practices described shock the

13  conscience. If anything, Plaintiffs' due process argument, which repeatedly mentions the

14  absence of a board to determine PREPA's fuel adjustment rate, seems to focus on

15  procedural, rather than substantive due process.  (Docket No. 7 at 29–30.)  We turn to that

16  argument now.

17    In order to establish a procedural due process violation, "the plaintiff must identify a

18  protected liberty or property interest and allege that the defendants, acting under color of

19  state law, deprived [him] of that interest without constitutionally adequate process."

20  Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011) (quoting Aponte–Torres

21  v. Univ. of P.R., 445 F.3d 50, 56 (1st Cir. 2006)).  Plaintiffs allege a deprivation of their

1   freedom to refrain from supporting political or religious associations with which they

2   disagree.  (Docket No. 7 at 8.)  The freedom of association is a protected liberty interest.

3   See NAACP v. State of Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958) (holding that

4   the "freedom to engage in association for the advancement of beliefs and ideas is an

5   inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth

6   Amendment, which embraces freedom of speech").  The question we must then assess is

7   whether "the process leading to that deprivation passes constitutional muster." Gonzalez-

8   Droz, 660 F.3d at 13.

9        "The basic guarantee of procedural due process is that, 'before a significant

10  deprivation of liberty or property takes place at the state's hands, the affected individual

11  must be forewarned and afforded an opportunity to be heard at a meaningful time and in a

12  meaningful manner.'" Id. (internal quotations and citations omitted). "No rigid taxonomy

13  exists for evaluating the adequacy of state procedures in a given case; rather, 'due process is

14  flexible and calls for such procedural protections as the particular situation demands.'"  Id.

15  (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

16       In this case, Plaintiffs identify the lack of a pre-deprivation hearing, the lack of an

17  independent board to determine the fuel adjustment rate, and the lack of transparency

18  surrounding the fuel adjustment rate.  (Docket No. 7.) At this early stage of the case, we find

19  these grievances are sufficient to state a viable procedural due process claim.  Defendants

20  have failed to present any specific arguments for dismissal of Plaintiffs' due process claims,

1    beyond timeliness and state action.  (Docket No. 17.)   We have already rejected these

2    arguments above.  (See supra, Section III.A.)

3          We are mindful of the First Circuit's instructions that "[i]n order to determine both

4    when a pre-deprivation hearing is compulsory and what process is due, an inquiring court

5    must balance a myriad of factors, including the private and public interests involved, the risk

6    of an erroneous deprivation inherent in the procedures employed by the state, and the likely

7    benefit that might accrue from additional procedural protections."  Gonzalez-Droz, 660 F.3d

8    at 13 (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). Further discovery will give

9    Plaintiffs, as well as the court, a chance to conduct the type of fact-specific inquiry that is

10   demanded in procedural due process cases.  Id.  We urge the parties to focus their efforts on

11   addressing these factors.

12         **F.  Equal Protection**

13         Plaintiffs also allege an equal protection violation, but they fail to present a coherent

14   or well-developed argument in support of their claim; only a few brief sentences are devoted

15   to explaining this cause of action.  (Docket No. 7 at 30, 34.)

16         In order to establish a viable equal protection claim, a plaintiff must "allege facts

17   indicating that, 'compared with others similarly situated, it was selectively treated . . . based

18   on impermissible considerations such as race, religion, intent to inhibit or punish the

19   exercise of constitutional rights, or malicious or bad faith intent to injure a person."

20   Barrington Cove Ltd. P'ship v. Rhode Island, 246 F.3d 1, 7 (1st Cir. 2001) (quoting

21   Rubinovitz v. Rogato, 60 F.3d 906, 909–10 (1st Cir.1995)).

Civil No. 11-1987 (JAF)                                                    -22-

1    In this case, Plaintiffs' allegations fall short of the mark.  Plaintiffs have failed even

2    to state who is the person that they allege is similarly situated to them.  The First Circuit has

3    said that to state a viable equal protection claim, it is "essential" for a plaintiff to allege he

4    was "similarly situated in all relevant respects" to the person who received allegedly

5    unequal treatment.  Id.  Without even a point of comparison to begin from, Plaintiffs' equal

6    protection claim necessarily fails. See id. ("in the Rule 12(b)(6) analysis . . . it [is] necessary

7    that [Plaintiffs] allege these correlations with reasonable particularity.")

8    Moreover, to the extent that Plaintiffs' equal protection argument is a restatement of

9    their First Amendment claim, it fails.  See Pagan, 448 F.3d at 36 (1st Cir. 2008) (explaining

10   that claims covered by the First Amendment cannot be repackaged as equal protection

11   claims).  Plaintiffs' equal protection claim will therefore be dismissed.

12   **G. Qualified Immunity**

13   Defendants argue that Marimar Pérez-Riera is entitled to qualified immunity.

14   (Docket No. 17 at 10).  According to Defendants, Plaintiffs "rest exclusively on their bald

15   allegation" that Pérez-Riera "manages and controls" the board of directors. (Docket No. 24

16   at 6–7.)  Defendants charge that Plaintiffs have alleged "no set of facts" to support a claim

17   that Pérez-Riera had reason to know her actions were violating Plaintiffs' constitutional

18   rights.  (Docket No. 24 at 7.)  Defendants correctly argue that Plaintiffs' allegations "do not

19   cite any individual actions [Pérez-Riera] personally took."   (Docket No. 17 at 10.)

20   Plaintiffs' complaint describes an apparently longstanding practice that predated Pérez-

21   Riera's arrival to the board; there is no reason to believe that Pérez-Riera bears any

Civil No. 11-1987 (JAF)                                                                                    -23-

1    individual responsibility for the unconstitutional practices.  We therefore grant Pérez-Riera

2    qualified immunity.

3           State or Commonwealth officers or employees sued in their personal capacity may

4    raise qualified immunity as an affirmative defense against damages liability.  Harlow v.

5    Fitzgerald, 457 U.S. 800, 808 (1982).  In fact, qualified immunity offers "defendant public

6    officials an immunity from suit and not a mere defense to liability." Maldonado v. Fontanes,

7    568 F.3d 263, 268 (1st Cir. 2009) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

8    "For this reason it is to be resolved at the earliest stage of litigation." Id. (citing Hunter v.

9    Bryant, 502 U.S. 224, 227 (1991)).

10          A court assessing qualified immunity must decide "(1) whether the facts alleged or

11   shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether

12   the right was 'clearly established' at the time of the defendant's alleged violation." Id. at

13   269 (1st Cir. 2009) (quoting Pearson v. Callahan, 555 U.S. 223, 234 (2009)). In order to

14   overcome qualified immunity, "[t]he contours of the right must be sufficiently clear that a

15   reasonable official would understand that what he is doing violates that right." Id.  "[The]

16   salient question is whether the state of the law at the time of the alleged violation gave the

17   defendant fair warning that his particular conduct was unconstitutional." Id.  Defendants

18   bear the burden of proof for establishing the affirmative defense. DiMarco-Zappa v.

19   Cabanillas, 238 F.3d 25, 35 (1st Cir. 2001) (citing Harlow, 457 U.S. at 815).

20          The First Circuit has stated that to overcome qualified immunity, "the plaintiff must

21   show that the official had actual or constructive notice of the constitutional violation."

1  Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 534 (1st Cir. 2011) (quoting

2  Rodríguez–García v. Miranda-Marín, 610 F.3d 756, 768 (1st Cir. 2010) (internal citations

3  omitted)).  Both the Supreme Court and the First Circuit have articulated the rationale for

4  such a rule: "An important factor in making the determination of liability is whether the

5  official was put on some kind of notice of the alleged violations, for one cannot make a

6  'deliberate' or 'conscious' choice to act or not to act unless confronted with a problem that

7  requires the taking of affirmative steps." Id. at 535 (quoting Pembaur v. City of Cincinnati,

8  475 U.S. 469, 483–84 (1986)).

9         In this case, Plaintiffs have failed to provide any non-conclusory, well-pleaded

10 allegations that a reasonable official in Pérez-Riera's position would have known that her

11 actions were violating constitutional rights.  (Docket No. 7.)  Indeed, the only lines in the

12 amended complaint that refer to Pérez-Riera in particular appear on page four.  (Docket No.

13 7 at 4.)  There the Plaintiffs state that Pérez-Riera "manages and controls" the board of

14 directors and is "vested with the establishment of discriminatory" prices.  (Id.) We deem

15 these "bare allegations to be too conclusory to be 'entitled to the assumption of truth.'"

16 Feliciano-Hernandez, 663 F.3d at 536 (quoting Iqbal, 556 U.S. at 679 (2009)).  Because

17 Plaintiffs have failed to show that Pérez-Riera had "fair warning that [her] particular

18 conduct was unconstitutional," Maldonado, 568 F.3d at 269, Defendants' motion to grant

19 Pérez-Riera qualified immunity will be granted.

20        **H. <u>Class Certification</u>**

1       Finally, we address Plaintiffs' contention that the best way to try this case is as a

2       class action.  (Docket No. 7 at 24–27.)  Much about the proposed definition of Plaintiffs'

3       classes—such as the "second class" of Robinson-Patman Act plaintiffs—has been rendered

4       moot by this opinion and order.  See supra, Section III.C.  Also, Defendants have still not

5       responded to Plaintiffs' arguments in favor of class certification.  (Docket Nos. 17; 24.)  Nor

6       have the parties had an opportunity to conduct discovery or reevaluate their litigation

7       strategies in light of this opinion.  Given the complexity of this case, as well as the factors

8       just described, it is still premature to decide whether to certify a class.  We will revisit this

9       issue after the parties have had time to review this opinion and perhaps reconsider their

10      litigation strategies.  See Yaffe v. Powers, 454 F.2d 1362, 64 (1st Cir. 1972) ("To pronounce

11      finally, prior to the allowance of any discovery, the nonexistence of a class or a set of

12      subclasses, when their existence may depend on information wholly within defendants' ken,

13      is contrary to the pragmatic spirit of Rule 23"); see also 7AA Charles Alan Wright, Arthur

14      R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1785.3 (3d ed. 2005)) ("As a

15      practical matter, the court's determination" of whether to certify a class "usually should be

16      predicated on more information than the complaint itself affords.").

17                             **IV.**

18                        **Conclusion**

19       For the foregoing reasons, Defendants' motion to dismiss is hereby **GRANTED IN**

20      **PART AND DENIED IN PART.**  (Docket No. 17.)  Plaintiffs' claims of procedural due

21      process and First Amendment violations, as well as their takings claim, will be allowed to

22      proceed.  Plaintiffs' substantive due process and equal protection claims are **DISMISSED**

23      **WITH PREJUDICE**; claims against co-defendant Pérez-Riera in her personal capacity are

Civil No. 11-1987 (JAF)                                                                           -26-

1    **DISMISSED   WITH   PREJUDICE**.    The  parties  are  ordered  to  appear  for  a  **Status**

2    **Conference on October 9, 2012 at 1:30 P.M.**

3          **IT IS SO ORDERED.**

4          San Juan, Puerto Rico, this 18th day of September, 2012.

5                                              s/José Antonio Fusté
6                                              JOSE ANTONIO FUSTE
7                                              United States District Judge
8
9

10