IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| DUAMEL SANTIAGO-RAMOS, ET AL., | |
| Plaintiffs, | |
| v. | CIV. NO.: 11-1987(JAG/SCC) |
| AUTORIDAD DE ENERGÍA ELÉCTRICA DE P.R., | |
| Defendant. | |

## REPORT AND RECOMMENDATION

In this action, a putative class consisting of most electric ratepayers in Puerto Rico sues Defendant Autoridad de Energía Eléctrica de Puerto Rico ("AEE"),[1] alleging that the rates that AEE charges its customers are unconstitutional in

---

**1.** AEE is a statutorily-created public utility with a monopoly on power generation and sale in Puerto Rico. The Court has already determined that AEE is a state actor for § 1983 purposes. *See* Docket No. 28, at 8–9; *see also Pérez v. AEE*, 741 F. Supp. 23, 26 (D.P.R. 1990) (holding that AEE is a state actor for § 1983).

various respects. On referrals from the presiding judge, I have been dealing with this case for some time. I previously recommended, Docket No. 90—and the presiding judge adopted, Docket No. 101—that a motion for summary judgment filed by AEE on the basis of claim preclusion be denied. I subsequently presided over a class certification hearing. *See* Docket No. 107. In a report and recommendation following that hearing, I determined that although Plaintiffs' offer of proof was weak (and the opposition weaker), the putative class likely satisfied the requirements of Rule 23(a) and (b)(3). Docket No. 111, at 23. Nonetheless, I offered a preliminary analysis of some of Plaintiffs' core claims and found them wanting, *id.* at 19–23;[2] I thus recommended that the presiding judge hold the motion to certify in abeyance and order AEE to file a motion for summary judgment on the claims' merits before certifying the class and forcing Plaintiffs to incur the substantial costs of class notice, *id.* at 23–24. The presiding judge adopted my recommendations and ordered a period of expedited discovery to be

---

**2.**   I also recommended that the Court refuse to appoint three of the four attorneys seeking to be class counsel. Docket No. 111, at 13–19; *see also* Docket No. 113 (holding recommendation in abeyance while dispositive motion practice is pending).

followed by dispositive motion practice. Docket No. 113.

AEE has now filed a motion for summary judgment seeking dismissal of this action, Docket No. 139, which has been referred to me for a report and recommendation, Docket No. 164. Surviving at this time are: (1) Plaintiffs' claims under the Takings Clause; (2) Plaintiffs' procedural due process claims; and (3) Plaintiffs' claims under the First Amendment's Establishment and Free Association Clauses. Below, I take up Plaintiffs' claims in that order. In doing so, and because some of Plaintiffs' claims should be dismissed even based on the facts they propose, I take up the parties' statements of uncontested material facts only insofar as is necessary to rule on the motion.

## I.   The Takings Clause

The Fifth Amendment's Takings Clause provides that private property shall not be "taken for public use, without just compensation." U.S. CONST., amend. V. The Clause "does not prohibit the taking of property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304, 314 (1987). Takings are thus not prohibited, but in the case of "otherwise proper interference" with private property by the

government, compensation is required. *Id.* at 315; *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) (explaining that "the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose"). Takings Claims are not the proper vehicle by which to seek relief for *impermissible* interference with property rights. *Lingle*, 544 U.S. at 543 ("[I]f a government action is found to be impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such an action.");[3] *see also Garcia-Rubiera v. Fortuño* ("*Garcia-Rubiera II*"), 665 F.3d 261, 277 (1st Cir. 2011) (explaining that where the plaintiffs complained of the allegedly illegitimate purpose to which the government put their funds, they were making a substantive due process—not a takings—argument).

Plaintiffs, acknowledging that they must identify a property

---

**3.** That said, a plaintiff who proves that a taking was for private benefit "is entitled to an injunction against the unconstitutional taking, not simply compensation." *Fideicomiso de la Tierra del Caño Martín Peña v. Fortuño*, 604 F.3d 7, 17 (1st Cir. 2010) (internal quotations omitted).

interest that has been interfered with,[4] point to a "proprietary interest in [AEE's] electric power services and in the monies paid for the purchase of those services." Docket No. 155, at 10. They allege that this interest has been interfered with in three ways: first, that there has been a physical taking for a private use, namely certain private entities that benefit from municipal power subsidies; second, that there has been a physical taking insofar as certain funds have been spent in violation of various Puerto Rico statutes; and third, that statutory subsidies benefitting a minority of AEE's subscribers effect a regulatory taking on the majority. There are numerous problems with Plaintiffs' theories, which I address below starting with their identification of a property interest.

### A. Plaintiffs fail to identify a valid property interest.

In effect, Plaintiffs point to two putative property interests: electric service itself, and the funds that pay for such services. With regard to an interest in utility services, Plaintiffs rely on

---

**4.** A takings claim entails a two-part inquiry. First, the plaintiff must point to a "recognized property interest which may be protected by the Fifth Amendment"; he must then show that this interest was taken without compensation. *Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores-Galarza*, 484 F.3d 1, 27–28 (1st Cir. 2010).

*Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1 (1978). *Memphis Light* is not really on point, however, because it recognized a property interest not in electricity service itself, but in the non-termination of that service during a dispute over an unpaid bill.[5] *See id.* at 5. Here, though, Plaintiffs are not complaining about their service being terminated; to the contrary, they are *paying* their bills and complaining about the

---

**5.** *Memphis Light* found a property interest based on Tennessee state law. Following *Memphis Light* courts in this district have found that customers of public utilities in Puerto Rico also have a property interest in continued service. *See, e.g., Marrero-Garcia v. Irizarry*, 829 F. Supp. 523, 528 (D.P.R. 1993) ("It is therefore clear that under Puerto Rico law a subscriber to a public utility services has a protectable property interest in the continued receipt of services."), *aff'd*, 33 F.3d 117 (1st Cir. 1994); *see also Albizu-Merced v. P.R. Elec. Power Auth.*, Civ. No. 11-1969(JAG), 2013 WL 101618, at *3 (D.P.R. Jan. 8, 2013) (same), *rev'd on reconsideration on other grounds*, 2014 WL 5844195 (D.P.R. Nov. 13, 2014). Non-subscribers, however, have been found to have no such interest. *See, e.g., Marrero-Garcia*, 829 F. Supp. at 528 ("This property interest is not extended to those receiving public utility services who are not subscribers, however."). Similarly, courts outside of this district have found that there is no property interest in the provision of *new* water service. *See, e.g., L&F Homes & Dev., LLC v. City of Gulfport, Miss.*, Civ. No. 10-387, 2012 WL 2994077, at *3 (S.D. Miss. July 20, 2012), *aff'd*, 538 F. App'x 395 (5th Cir. 2013); *Ramos v. Proulx*, Civ. No. 82-422, 1987 WL 8385, at *2 (D. Mass. Mar. 25, 1987); *see also Nat'l Educ. Ass'n—R.I. ex rel. Scigulinsky v. Ret. Bd. of R.I. Employees' Ret. Sys.*, 172 F.3d 22, 29 (1st Cir. 1999) (explaining that there is no Fifth Amendment property interest even in "entirely plausible expectations of economic benefit").

uses to which those payments are put. I therefore see no basis for holding that AEE customers have a property interest in electric services as such.[6]

Plaintiffs also point to their interest in the funds used to purchase electricity from AEE, though they are unspecific about whether their putative interest is in the pre-purchase or post-purchase funds. This matters because once the money is paid to AEE, it belongs to AEE rather than the ratepayer—which is to say that Plaintiffs lose their property interest in the funds once they pay them to AEE.[7] *Cf. Roedler v.*

---

**6.**  Even if Plaintiffs did have a property interest in electric service, their claim would fail because they cannot plausibly argue that such an interest was *taken*. That is, Plaintiffs are paying for *and receiving* electrical services, but they are unhappy about the amount that they are spending and the purposes for which their payments are being used. Furthermore, if Plaintiffs were asserting an interest in a particular electricity rate, or in a rate that reflected AEE's compliance with the law, I would still have to conclude that no such property interest exists. *See, e.g., Coleman v. Sanitation Dist. No. 1 of N. Ky.*, Civ. No. 13-2, 2014 WL 705322, at *6 (E.D. Ky. Feb. 24, 2014) (collecting cases and holding that ratepayers have no property interest in particular electricity rates or rates reflecting utility compliance with the law); *Crosby v. City of Jackson*, 813 F. Supp. 476, 480 (S.D. Miss. 1993) (similar), *aff'd*, 5 F.3d 528 (5th Cir. 1993).

**7.**  The money paid to AEE for electrical service is different than the premiums paid for compulsory state car insurance in *Garcia-Rubiera v. Calderon* ("*Garcia-Rubiera I*"), 570 F.3d 443 (1st Cir. 2009). In that case,

*U.S. Dep't of Energy* ("*Roedler I*"), Civ. No. 98-1843, 1999 WL 1627346, at *10 (D. Minn. Dec. 23, 1999) ("The Plaintiffs cannot demonstrate ownership of the property at issue, which are the fees that [the defendant] paid [to the United States], and thus have no standing to pursue a taking claim. The Plaintiffs concede that they simply paid their monthly electricity bills. Revenue paid by the customers for service belongs to the company."), *aff'd*, 255 F.3d 1347 (Fed. Cir. 2001) ("*Roedler II*");[8] *see also Bd. of Pub. Utility Commn'rs v. N.Y. Tel. Co.*, 271 U.S. 23, 31 (1926) ("The revenue paid by the customers for [utility] service belongs to the company."). On the other hand, the pre-payment funds—in which Plaintiffs undoubtedly have an interest—are merely the costs to Plaintiffs of purchasing electricity. Those funds are thus not *taken*, they are paid for services rendered. *Cf. Roedler I*, 1999 WL 1627346, at *10. And

---

insureds retained a property interest in their paid premiums because those premiums were held "in a fiduciary capacity" while the insureds were given the opportunity to seek recoupment upon proof of private insurance. *Id.* at 452. AEE clients have no such continuing interest in the money they pay AEE for utility service.

**8.** On appeal, the Federal Circuit affirmed the district court's judgment in *Roedler*, repeating the district court's standing analysis; it is not clear, however, whether it endorsed that analysis. *See Roedler v. U.S. Dep't of Energy*, 255 F.3d 1347, 1355 (Fed. Cir. 2001).

Plaintiffs actual complaints concern what is done with the money *after* it is paid—and after it is no longer their property. In similar circumstances, the Federal Circuit in *Roedler II* held that a plaintiff would not be able to satisfy Article III's "injury in fact" requirement. 255 F.3d at 1355–56. Specifically, that court held that customers of an electric utility, "who paid passed-through costs" to the government via the rates paid to the company and "thus suffered indirect economic injury" when the government failed in its obligations to the utility, lacked standing to sue for a taking, even though the utility might have had standing to sue for its own injuries. *Id.* (citing *Ben Oehrleins v. Hennepin Cnty.*, 115 F.3d 1372, 1379–81 (8th Cir. 1997)). Thus, if Plaintiffs' putative property interest is in the post-payment funds, they in fact have no interest; and if it is in the pre-payment funds, they have an interest but no injury.

A further problem with the property interest that Plaintiffs identify is that, as a general matter, a requirement to pay money is not a taking. In *United States v. Sperry*, for instance, the plaintiff, a successful claimant before the Iran-United States Claims Tribunal, argued that a fee paid to the United States out of its award constituted a taking. *See* 493 U.S. 52, 58 (1989). The Supreme Court rejected this argument, writing that it was

"artificial to view deductions of a percentage of a monetary award as physical appropriations of property." *Id.* at 62 n.9. To the contrary, the Court held, the government may—and routinely does—require the payment of fees for its services, and these are not takings. *Id.* at 62 n.9 & surrounding text. Likewise, Justice Kennedy, in his concurring opinion in *Eastern Enterprises v. Apfel*, wrote that a law requiring a coal company to make significant cash payments to plans for the benefit of certain retirees was not a taking because though the law required the payment of money, it "neither target[ed] a specific property interest nor depend[ed] upon any particular property for the operation of its statutory mechanisms." 524 U.S. 498, 543 (1998) (Kennedy, J., concurring).[9]

Several courts of appeals, including the *en banc* Federal Circuit, have interpreted *Eastern Enterprises* as holding that "the Takings Clause does not apply to legislation requiring the

---

**9.**  The *Eastern Enterprises* court did not produce a majority opinion, but more recent Supreme Court precedent suggests that Kennedy's concurrence is controlling on this point. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586 (2013) (focusing on Kennedy's *Eastern Enterprises* concurrence); *see also Am. Council of Life Insurers v. Dist. of Columbia Health Benefit Exchange Auth.*, — F. Supp. 3d —, 2014 WL 5893464, at *19 (D.D.C. 2014) ("[T]he majority of the *Koontz* Court left intact the plurality view reflected in *Eastern Enterprises* . . . .").

payment of money"—at least where that money does not constitute an identifiable fund and is not tied to a specific piece of property. *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1329, 1338 (Fed. Cir. 2001) (en banc); *see also W. Va. CWP Fund v. Stacy*, 671 F.3d 378, 386–87 (4th Cir. 2011) (collecting cases and holding that "a monetary obligation does not implicate the Takings Clause"); *McCarthy v. City of Cleveland*, 626 F.3d 280, 285 (6th Cir. 2010) ("[A]ll circuits that have addressed the issue have uniformly found that a taking does not occur when the statute in question imposes a monetary assessment that does not affect a specific interest in property."); *Parella v. Ret. Bd. of R.I. Employees' Ret. Sys.*, 173 F.3d 46, 58 (1st Cir. 1999) ("[A] Takings Clause issue can arise only after a plaintiff's property right has been independently established." (citing *E. Enters.*, 524 U.S. at 539–47 (Kennedy, J., concurring)).

The Supreme Court's opinion in *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586 (2013), confirms that these cases are correct in general principle. *Koontz* concerned whether a taking occurred when the government conditioned the approval of a land-use permit on the payment of a fee. *See id.* at 2591. Focusing on the fact that the exaction "burdened petitioner's ownership of a specific parcel of land," the Su-

preme Court held that the exaction was qualitatively different than the payment of money demanded in *Eastern Enterprises*. *Id.* at 2599. Because it was tied to a specific property interest apart from the money itself, the Court explained that the exaction in *Koontz* was unlike typical taxes and fees, which the Court affirmed were not takings. *Id.* at 2600–01. Another court has thus interpreted *Koontz* as holding that "a general monetary exaction does not qualify as 'a specific, identifiable property interest' . . . to serve as a predicate for a takings claim." *Am. Council of Life Insurers v. D.C. Health Benefit Exchange Auth.*, — F. Supp. 3d —, 2014 WL 5893464, at *20 (D.D.C. 2014) (quoting *Koontz*, 133 S. Ct. at 2600).

Here, the funds in which Plaintiffs claim a putative property interest are simply the fees that they pay for a service. They are not tied to any specific fund, nor are they related to any other particular property. Plaintiffs interest in these funds may not, therefore, serve as the basis for a takings claim. *Cf. Dudley v. United States*, 61 Fed. Cl. 685, 689 (2004) ("It is well-settled that the government may require fees for public use of certain services without causing a taking." (citing *Sperry*, 493 U.S. at 63)).

### B.  There was no physical or *per se* taking.[10]

As explained above, I do not think that Plaintiffs point to a property interest sufficient to form the basis for a takings claim. Even if they did, however, their physical takings claims would fail for other reasons.

Plaintiffs first argue that their property has been unconstitutionally taken for a private use. AEE is tax-exempt, but in exchange for that exemption it must contribute 11% of its gross income, derived from the sale of electric power to consumers like Plaintiffs, to pay for certain statutory subsidies. *See* P.R. LAWS ANN. tit. 22, § 212(b). Among these subsidies is a contribution to the municipalities. *Id.* § 212(b)(2). According to

---

**10.** The doctrinal categorization of takings claims is somewhat murky. Generally, physical takings claims refer to cases where physical property is invaded by the government. Regulatory claims, by contrast, were traditionally divided into two categories: *per se* takings, where non-tangible things were taken in a way that resembled physical takings; and claims governed by *Penn Central*'s *ad hoc* balancing. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). Some recent cases, however, seem to distinguish between *per se* and regulatory takings as if they belong to different categories. *See, e.g., Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235 (holding that there was a *per se* taking and *not* a regulatory taking); *Koontz*, 133 S. Ct. at 2600 (differentiating between regulatory and *per se* takings). Because the analytical frameworks are similar, I will refer to *per se* and physical takings together, and I will use "regulatory taking" to refer to claims governed by *Penn Central.*

Plaintiffs, the municipalities have effectively passed on these subsidies to private entities that rent space in municipality-owned buildings.[11] Docket No. 155, at 13.

Putting aside Plaintiffs' inability to show a taking in the first place, Plaintiffs' "private use" claim founders because it fails to show that any taking would not have been in the public interest. The Supreme Court has held that "review of whether a taking is for public use is necessarily deferential." *Fideicomiso de la Tierra del Cano Martin Pena v. Fortuño*, 604 F.3d 7, 18 (1st Cir. 2010) (internal quotations omitted). Put simply, the government may, consistent with the Constitution, take property from one private person and give it to another private person, so long as its "purpose is legitimate and its means are not irrational." *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 242–43 (1984); *see also Kelo v. City of New London, Conn.*, 545 U.S. 469, 483 (2005) ("For more than a century, our public use jurisprudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in

---

**11.** It is not entirely clear whether Plaintiffs are saying that the municipalities, the businesses, or both benefit from this arrangement. *See* Docket No. 155, at 13. However, I do not think that this difference, to the extent that there is a difference, is relevant to the above analysis.

determining what public needs justify the use of the takings power."). Here, Plaintiffs have not even tried to meet their heavy burden of showing that the municipalities' use of the funds was irrational or illegitimate. Instead, they have simply asserted it, Docket No. 155, at 13–14, and in doing so they have waived their arguments.[12] *Cf. United States v. Nieves-Velez*, 28 F. Supp. 3d 131, 133 n.1 (D.P.R. 2014) ("Because we find his argument was perfunctory, at best, the court shall deem it waived." (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990))).

Plaintiffs' other physical-taking theory is that the municipalities' use of their credits violated Law 233 of 2011 and Law 57 of 2014, effecting a taking of Plaintiffs' property. Once again putting aside the lack of a property interest, this theory fails because it misunderstands the nature of a taking claim. Fundamentally, the takings clause is concerned with "*otherwise proper*" governmental interference with property rights. *First*

---

**12.** Much of Plaintiffs' "private use" argument seems to bleed into allegations that the municipalities' use of the funds was illegal. *See* Docket No. 155, at 13 (referring to the municipalities' "unauthorized use and . . . unjustified use of the credit"). I deal with that contention—which has nothing to do with whether there was a taking for private use—below.

*English*, 482 U.S. at 315 (emphasis added). That is, the Takings Clause presupposes that the government may take the property and is doing so for a legitimate reason, and it simply ensures that the property's owner is compensated. But where the government's purpose is impermissible, the Takings Clause is not implicated, because "[n]o amount of compensation can authorize such action." *Lingle*, 544 U.S. at 543. It should be obvious, then, that a takings claim premised on the government's allegedly illegal use of the seized property is not a takings claim at all; it is a due process claim. *See id.* (explaining that a due process claim is "logically prior to and distinct from the question" of whether a taking occurred); *Garcia-Rubiera II*, 665 F.3d at 277 ("Plaintiffs' argument that the Commonwealth's purpose in collecting and retaining custody over the duplicative payments 'is not legitimate' is an argument that goes to the core of substantive due process law.").

### C.  There was no regulatory taking.

In addition to the lack of a property interest, which applies to Plaintiffs' regulatory taking claim just as it does their physical takings claim, there is a threshold question of whether a regulatory-takings framework is appropriate for consideration of a claim concerning the taking of *money*. In *Brown v.*

*Legal Foundation of Washington*, for example, the Supreme Court held that a *per se* taking analysis—rather than a regulatory taking analysis—was proper in considering the alleged taking of small amounts of interest accruing to the plaintiffs' funds held in IOLTA accounts.[13] 538 U.S. 216, 235 (2003). Likewise, in *Koontz*, the Supreme Court held that an exaction related to a specific property "would amount to a *per se* taking similar to the taking of an easement or a lien." 133 S. Ct. at 2600. It would seem, then, that a regulatory-takings approach would be inconsistent with Supreme Court precedent. *Cf. Am. Council of Life Insurers*, 2014 WL 5893464, at *20–21 (holding that no regulatory taking occurred where the claim regarded the payment of money); *Levin v. City & Cnty. of San Francisco*, — F. Supp. 3d —, Civ. No. 14-3352, 2014 WL 5355088, at *9 (N.D.

---

**13.** Interest on Lawyers Trust Accounts programs are used throughout the United States to fund indigent legal services. *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 161–62 (1998). When attorneys receive client funds in nominal amounts, they place them in so-called IOLTA accounts, and the interest that accrues in such accounts is given to state legal services funds. *See id.* at 162. In *Phillips*, the Supreme Court held that the interest on a client's money accrued while in an IOLTA account is unquestionably the property of the client. *Id.* at 172. In *Brown*, the Court held that the taking of this interest by the state is a *per se* taking, but it clarified that compensation is not due if the taking resulted in no pecuniary loss. 538 U.S. at 235–37.

Cal. Oct. 21, 2014) (following *Koontz* and applying a *per se* approach to a claim for the taking of money).

And even if that were not true, Plaintiffs' regulatory claim would fail if considered on its merits. Challenges to regulatory takings are governed by a set of standards first enumerated in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). Though application of these factors can be difficult, they all "share a common touchstone": each "focuses directly upon the severity of the burden that the government imposes upon private property rights."[14] *Lingle*, 544 U.S. at 539. But the government regularly adjusts private parties' rights and relationships, and each such adjustment cannot be considered a taking. *Id.* at 538. The question is thus whether the government's regulation "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *cf. P.R. Tel. Co. v. Telecomms. Regulatory Bd. of P.R.*, 189 F.3d 1, 18 (1st Cir. 1999) (rejecting takings claim where the

---

**14.** My analysis does not depend upon the specific *Penn Central* factors, and so I do not enumerate them. I note, however, that an especially thorough treatment of the factors can be found in *Maine Education Association Benefits Trust v. Cioppa*, 695 F.3d 145 (1st Cir. 2012).

government' "action [was] 'a public program that adjusts the
benefits and burdens of economic life to promote the common
good' in a highly regulated context" (quoting *McAndrews v.
Fleet Bank of Mass., N.A.*, 989 F.2d 13, 19 (1st Cir. 1993))).

Plaintiffs' allegations reveal that what they are challenging
is the legislature's broad-scale decision about how the burdens
of paying for electric power should be distributed.[15] Referring
to the supposedly confiscatory subsidies, Plaintiffs complain
that "around 33% of [AEE's] clients enjoy a much lower cost of
electricity consumption that is being subsidized by 67% of its
clients." Docket No. 155, at 15. This simply cannot be construed
as a few individuals being forced to shoulder the costs of a
public good benefitting the minority. To the contrary—the
precise contrary, really—this is a case of the *majority* bearing
some of the costs associated with assisting a *minority* that the
legislature has decided needs special assistance. This is not
unlike Medicare, Medicaid, Social Security, or progressive
income taxation. It is, in short, not a taking at all. *See, e.g.,*

---

**15.** For example, in their second amended complaint, Plaintiffs complain
about subsidies to public housing facilities, which, in Plaintiffs' words,
"ha[ve] traditionally become zest [*sic*] pools of crime and violence."
Docket No. 41, at 15.

*Mathews v. De Castro*, 429 U.S. 181, 185 ("Governmental decisions to spend money to improve the general public welfare in one way and not another are not confided to the courts. The discretion belongs to Congress unless the choice is clearly wrong, a display of arbitrary power, [or] not an exercise of judgment." (internal quotations omitted)).

## II.  Due Process

Plaintiffs also bring a procedural due process claim, though its specifics are hard to follow. Simplified, Plaintiffs complain that their property—the same interests identified above—has been taken and put to illegitimate or illegal uses. They further complain that these deprivations have been procedurally improper, lacking notice and a pre- or post-deprivation hearing. *See* Docket No. 155, at 19–22. Fundamentally, Plaintiffs' due process claim fails because of their inability to locate a valid property interest. On this point, my analysis above suffices:[16] Plaintiffs have no property interest in electricity power as such, and they have no property interest in money

---

**16.**  *See Garcia-Rubiera v. Calderon* ("*Garcia-Rubiera I*"), 570 F.3d 443, 457 (1st Cir. 2009) ("In general, we perform the same analysis in determining whether a property interest is sufficient under both the Takings Clause and the Due Process Clause.").

paid to AEE for purchase of a service, *see Roedler II*, 255 F.3d at 1355–56. Plaintiffs do, of course, have a property interest in their own money *before* they pay it, but this money is not taken; it is paid to purchase electricity. *See Roedler I*, 1999 WL 1627346, at *10.

Furthermore, there is no deprivation. *Garcia-Rubiera I*, 570 F.3d at 457 ("Once a property interest is established, Plaintiffs must then show that the defendants, acting under color of state law, *deprived* [them] of that property interest without constitutionally adequate process." (internal quotations omitted)). If Plaintiffs' property interest is in electricity services, their claim fails because there are no allegations that such service has been lost. And if it is in their pre-payment funds, Plaintiffs are paying for services, not having their money taken by the government. But reading Plaintiffs' opposition to the motion for summary judgment carefully, it is clear that what they are *really* complaining about is the uses to which their post-payment funds are put, though they attempt to frame this in terms of procedural rights.[17] A challenge to the underlying use

---

**17.** So, for example, Plaintiffs seek a hearing in which they can challenge the allegedly illegal way AEE spends its revenues, but they do so without first showing that they have a property interest in those

of AEE's revenues implicates substantive, not procedural, due process. *See Garcia-Rubiera II*, 665 F.3d at 277; *see also Roedler II*, 255 F.3d at 1355–56 (citing *Ben Oehrleins*, 115 F.3d at 1379–81). But Plaintiffs' substantive due process claims were dismissed more than two years ago. Docket No. 28, at 18–19.

Defendants' motion for summary judgment should be granted as to Plaintiffs' procedural due process claims.

### III.   First Amendment

Finally, Plaintiffs bring claims under the First Amendment's Establishment and Free Association clauses. AEE moved for summary judgment on these claims, and in response Plaintiffs "voluntarily move[d] for [their] dismissal." Docket No. 155, at 1. It is not clear under what procedural mechanism Plaintiffs make this motion, however, nor is it clear whether they are seeking dismissal with or without prejudice. At this stage in the proceedings, Rule 41 would not permit Plaintiffs to dismiss without Court approval. *See* FED. R. CIV. P. 41(a)(2). And given the age of this case and the amount of effort that has gone into litigating these particular claims, I would only permit dismissal with prejudice. *See id.*; *cf. Lindell v. O'Donnell*, No. 05-C-04, 2005

---

revenues being spent legally. *Cf. Coleman*, 2014 WL 705322, at *6; *Crosby*, 813 F. Supp. at 480.

WL 1190023, at *1 (W.D. Wis. May 18, 2005) ("Because defendant has been required to defend this action, plaintiff's motion for voluntary dismissal is proper only on the condition that the dismissal is with prejudice."). Furthermore, as AEE points out, Rule 41 is not the right mechanism by which to dismiss fewer than all of a plaintiff's claims against a defendant. *See, e.g.*, *Bailey v. Shell Western E&P, Inc.*, 609 F.3d 710, 720 (5th Cir. 2010) ("Rule 41(a) dismissal only applies to the dismissal of an entire action—not particular claims."). Instead, seeking amendment of the complaint under Rule 15 is proper. *See* 9 WRIGHT & MILLER, FED. PRAC. & PROC. § 2362 (3d ed.) ("A plaintiff who wishes to drop some claims but not others should do so by amending his complaint pursuant to Rule 15.").

Plaintiffs have sought no amendment, and even if their motion to dismiss were treated as a motion to amend, *cf. Loutfy v. R.R. Donnelley & Sons, Co.*, 148 F.R.D. 599, 602 (N.D. Ill. 1993) (treating motion to dismiss a single claim as a motion to dismiss), the motion would be denied for the same reason that a motion to dismiss voluntarily would be: it would leave the defendant at risk of future litigation on this matter despite having expended substantial time and resources in defending the claim. This would be especially prejudicial given the

frankly weak nature of Plaintiffs' First Amendment challenges. Thus, AEE deserves a ruling on the merits, and Plaintiffs cannot be permitted skirt that ruling through a last-minute amendment.

The Court has previously put Plaintiffs on notice of what it thinks are the infirmities in their First Amendment claims. In light of that notice, AEE has asked for summary judgment on those claims and Plaintiffs have failed to point to any issues of material fact that would preclude their dismissal; to the contrary, Plaintiffs have effectively abandoned them. As such, I recommend that AEE's motion for summary judgment be granted and that Plaintiffs' First Amendment claims be dismissed.

## IV.    Conclusion

Plaintiffs takings claims must be dismissed because they have failed to identify a valid property interest—and have not, in fact, had anything taken from them. Their procedural due process claims fail for similar reasons. And they have abandoned their First Amendment claims. For these reasons, I RECOMMEND that the motion for summary judgment, Docket No. 139, be GRANTED and these claims be DISMISSED WITH PREJUDICE.

IT IS SO RECOMMENDED.

The parties have fourteen days to file any objections to this report and recommendation. Failure to file the same within the specified time waives the right to appeal this report and recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir. 1994); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 26th day of February, 2015.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE